270-11/MEU/MF

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In the Matter of the Arbitration, | 14-cv-6412 (NRB) |
| Between | |
| HESS CORPORATION | **ORAL ARGUMENT REQUESTED** |
| Petitioner, | |
| and | |
| DORADO TANKERS POOL, INC., | |
| Respondent. | |

**MEMORANDUM OF LAW IN OPPOSITION TO
HESS' PETITION TO CONFIRM ARBITRATION AWARD AND
IN SUPPORT OF DORADO'S APPLICATION TO VACATE THE AWARD**

Michael E. Unger (unger@freehill.com)
Michael Fernandez (fernandez@freehill.com)
FREEHILL HOGAN & MAHAR LLP
80 Pine Street
New York, New York 10005
Tel: (212) 425-1900 / Fax: (212) 425-1901

*Attorneys for Respondent Dorado Tankers Pool, Inc.*

421772.1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

SUMMARY OF ARGUMENT .................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................................... 2

    I.    SUMMARY OF CHARTER PARTY AND VOYAGE ............................................................ 3

    II.    THE CONTAMINATED JET FUEL CARGO .................................................................... 3

        A.   The Tank 235 Cargo ........................................................................................ 4

        B.   The Tank 309 Cargo ........................................................................................ 5

    III.   THE CLAIMS IN ARBITRATION .................................................................................. 6

    IV.   THE ARBITRATION ................................................................................................... 7

LEGAL DISCUSSION .................................................................................................................. 8

    I.    DORADO'S APPLICATION TO VACATE THE AWARD AND HESS'S APPLICATION TO CONFIRM THE AWARD ARE GOVERNED BY THE FAA ..................................................... 9

    II.   THE AWARD WAS RENDERED IN MANIFEST DISREGARD OF THE ESTABLISHED LAW ON DAMAGES WHICH PROHIBITS A PARTY FROM RECEIVING A WINDFALL AND REQUIRES THAT THE FRUITS OF REASONABLE MITIGATION EFFORTS BE ACCOUNTED FOR IN THE DAMAGE CALCULATION .............................................................................................. 10

        A.   The Law on Damages in a COGSA Case is Well-Defined, Explicit, and Clearly Applicable ............................................................................................ 10

        B.   The Arbitrators Knew of the Governing Damage Law Principles Yet Refused to Apply Them or Ignored Them Altogether .................................................... 11

CONCLUSION ........................................................................................................................... 13

CERTIFICATE OF SERVICE .................................................................................................... 14

**CASES**

*Cellu-Beep, Inc. v. TeleCorp Communs., Inc.*, 13 Civ. 7236 (NRB), 2014 U.S. Dist. LEXIS 98037 (S.D.N.Y. July 17, 2014) .................................................................. 8

*Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383 (2d Cir. 2003) .............. 10

*Hale Container Line, Inc. v. Houston Sea Packing Co.*, 137 F.3d 1455 (11th Cir. 1998) ............. 11

*Hall Street Assocs. L.L.C. v. Mattel, Inc.*, 128 S.Ct. 1396 (2008) ...................................... 10

*Jock v. Sterling Jewelers Inc.*, 2011 U.S. App. LEXIS 13633 (2d Cir. July 1, 2011) ................. 10

*Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115 (2d Cir. 1987) ......................... 10

*M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103 (2d Cir. 1985) ............................ 11

*Marine Office of America Corp. v. Lilac Marine Corp.*, 296 F. Supp.2d 91 (D. P.R. 2003) ........ 11

*NYKCool A.B. v. Pac. Fruit, Inc.*, 507 Fed. App'x 83 (2d Cir. 2013) .................................... 9

*Shonac Corp. v. Maersk, Inc.*, 159 F. Supp.2d 1020 (S.D. Oh. 2001) .................................. 11

*Sogem-Afrimet, Inc. v. M/V Ikan Selayang*, 951 F. Supp. 429 (S.D.N.Y. 1996) ..................... 11

*Stolt-Nielsen*, 130 S. Ct. 1758 (2010) ........................................................................ 10

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329 (2d Cir. 2010) .................... 9

*Wallace v. Buttar*, 378 F.3d 182 (2d Cir. 2004) ............................................................ 10

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" US, Inc.*, 126 F.3d 15 (2d Cir. 1997) ......... 9

**OTHER AUTHORITIES**

9 U.S.C. §§ 1 *et seq* ................................................................................................ 9

9 U.S.C. §§ 201-208 ................................................................................................ 9

9 U.S.C. § 202 ........................................................................................................ 9

Convention on the Recognition and Enforcement of Foreign Arbitral Awards ....................... 9

## PRELIMINARY STATEMENT

Dorado Tankers Pool Inc. ("Dorado") submits this memorandum in support of its application to vacate the aspects of a New York arbitration award issued on July 23, 2014 (the "Award"), which held Dorado liable for a theoretical reduction in cargo value and for expenses incurred in mitigation without giving Dorado any credit for the fruits of the mitigation effort as required by established law (even when Hess admitted that it had successfully mitigated and suffered no loss with respect to about half of the contaminated cargo).[1] This memorandum is also submitted in opposition to the petition to confirm the same aspects of the Award filed by Hess Corporation ("Hess").

## SUMMARY OF ARGUMENT

Dorado seeks vacatur of aspects of the Award fully recognizing that federal policy generally favors the finality of arbitral awards in the ordinary course and aware of the fact that courts advocate a limited approach to the exercise of judicial review of arbitral decisions. Yet, in the circumstances of this case, Dorado is compelled to seek the Court's intervention and does not present this application without a sound basis.

The issue presented is not overly complicated and is fairly discrete. Hess lodged a claim for the contamination of a cargo of jet fuel, for which liability was admitted. The Panel was charged with determining the recoverable damages. In its analysis, the Panel recognized that Hess had a duty to mitigate and found that Hess took reasonable steps to mitigate the loss (which steps included blending the contaminated cargo with other product already in tanks ashore and subsequently selling or otherwise utilizing the cargo as CPL-54 grade jet fuel). The Panel then

---

[1] As described more fully herein, the Panel awarded Hess damages for the downgraded value of the full volume of the subject cargo and a percentage of the costs it would not have incurred but for the mitigation efforts, for a total of $963,805 together with interest. Dorado challenges this aspect of the Award. Dorado does not challenge the aspects of the Award pertaining to the demurrage and shifting expenses awarded to Dorado and against Hess.

421772.1                               1

awarded Hess expenses incurred in mitigating the loss. Yet, the Panel completely disregarded any of the revenue and benefits received by Hess from its mitigation efforts. The Panel consequently awarded Hess damages based on a supposed reduction in the value of the cargo coupled with mitigation expenses without considering the other half of the equation -- the revenue and benefits to Hess -- even where Hess had admitted it suffered <u>no loss</u> on approximately half of the cargo due to its mitigation efforts. In so doing, the Panel compensated Hess far beyond the actual loss sustained resulting in a windfall to Hess.

Apart from the fact that the Panel's Award is internally inconsistent (*i.e.*, awarding Hess mitigation expenses but not accounting for any mitigation revenue/benefits), the Award demonstrates a manifest disregard of the established law on damages. A party is not entitled to receive a windfall and cannot recover more than the actual loss sustained, and accordingly, any revenue/benefits received in mitigation must be accounted for. The failure to do so, while finding that Hess reasonably mitigated and awarding Hess expenses incurred in mitigation, demonstrates that the Panel was aware of the law on mitigation, yet refused to apply it, and violated fundamental principles of the law on damages. Consequently, the aspects of the Award awarding Hess damages based upon the theoretical loss in value of the cargo, plus mitigation costs, without accounting for any mitigation revenue/benefits should be vacated.

## FACTUAL BACKGROUND

This application concerns the Panel's manifest disregard of the law, and although Dorado believes that the Panel also committed some errors in its fact finding, Dorado does not challenge those facts here. Accordingly, the facts here are largely taken from the Award and supplemented from the record where necessary.

I.     SUMMARY OF CHARTER PARTY AND VOYAGE

This dispute concerns a July 2011 charter party for the M/T SWARNA MALA between Dorado as time-chartered owner and Hess as charterer. (*See* Award p. 2, attached as Ex. 1 to the accompanying Declaration of Michael Unger, the "Unger Decl."). The charter provided for the carriage of petroleum products to be shipped by Hovensa LLC ("Hovensa") from St. Croix to a range of U.S. Atlantic Coast and East Coast Canadian ports. (*Id.*) On the voyage at issue, the vessel was to proceed to St. Croix to load two separate cargoes, namely, a cargo of jet fuel and a cargo of #2 heating oil, and then sail to Hess' facility at Bayonne for discharge orders although final discharge was not yet determined and Hess had not pre-sold any of the cargo or committed it commercially. (Award p. 2).

In accordance with Hess' instructions, the vessel proceeded to the load port and loaded the jet fuel[2] and #2 heating oil cargoes. After loading was completed, it was determined that the jet fuel cargo had become contaminated with the #2 oil. After the vessel arrived at New York harbor, the contaminated jet fuel cargo (about 112,289 barrels) was discharged into two barges which, in turn, discharged the cargo into two shore tanks -- Tank 309 and Tank 235. (Award p. 3).

II.     THE CONTAMINATED JET FUEL CARGO

The vessel arrived in the New York area in August 2011 and the contaminated jet fuel cargo was thereafter transferred to storage tanks controlled by Hess. About half of the cargo (58,000 barrels) was transferred to Tank 235, and the other half (approximately 55,000 barrels)

---

[2] Jet fuel is also known as aviation turbine fuel and kerosene and is a petroleum distillate. There are numerous grades of jet fuel and kerosene. For purposes of this matter, the relevant grades of jet fuel are CPL-55 (the highest grade), "Low Sulfur Jet/Kero" (an intermediate grade), and CPL-54 (a lower grade). The value of #2 oil is also relevant. (*See, e.g.,* Unger Decl. Ex. 3, Hess main brief at pp. 8-10 with explanation of different grades of jet fuel.)

421772.1                                                                     3

was transferred to Tank 309.[3] For purposes of analyzing the issues presented by this application, it is useful to consider each tank separately. (For purposes of this discussion, the two parcels will be referred to as the "Tank 235 Cargo" and the "Tank 309 Cargo.")

### A. The Tank 235 Cargo

On August 8, 2011, the Tank 235 Cargo was loaded on top of about 68,900 barrels already present in that tank. As the Panel found, "the pre-existing cargo in Shore Tank 235 was already 'off spec'." (Award p. 9). Luckily for Hess, the addition of the Tank 235 Cargo actually improved the value of the cargo already in the tank and "it became more marketable as a result of the Vessel's cargo [*i.e.*, the Tank 235 Cargo]" being loaded on top." (Award p. 9).

In other words, the mere act of placing the Tank 235 Cargo into that shore tank (without any other preparation, treatment or blending) resulted in the combined cargo (totaling about 112,000 barrels) meeting the specifications for, and hence having the value of, CPL-54 grade jet fuel.[4] (*See* Unger Decl. at Ex. 6, consisting of Owner's Ex. F & Black Tr. at 385-87, 405, 508, & Owner's Ex. C confirming that nothing further was done with respect to Tank 235 between the time the Tank 235 Cargo was loaded therein and when tests confirmed the entire contents of the tank met CPL-54 specifications). Indeed, shortly after the blending, Hess was able to swap (*i.e.*, sell)[5] approximately 25,027 barrels from Tank 235 as CPL-54 grade jet. (Unger Ex. 7, consisting of Owner's Ex. I & Black Tr. at 387).[6]

---

[3] The Tank 235 cargo had been transported by barge from the vessel on August 6, 2011, and the Tank 309 cargo had been transported by barge from the vessel on August 7, 2011.

[4] *See* note 2, *supra*, discussing the grades of jet fuel.

[5] A swap is essentially a sale by which Hess received the benefit of the value of 25,027 barrels as CPL-54 jet fuel.

[6] During the arbitration, Hess' witness admitted that no claim would be made in the arbitration for these 25,027 barrels. (*See* Unger Decl. at Ex. 8, consisting of Ammirati Tr. at 75-76). Yet, as discussed herein, the Panel nevertheless included this quantity when it awarded Hess damages for the alleged downgrading of the jet fuel cargo from LS Jet/Kero to #2 oil.

421772.1                                    4

With respect to the jet fuel remaining in Tank 235, Hess decided to take advantage of the fact that the cargo (as a mere result of the blending with the pre-existing off-spec cargo in the tank) met the specifications for CPL-54 grade jet fuel and utilized the cargo in its routine blending program to "blend up" light cycle oil ("LCO") to #2 oil. Hess generates LCO at its refinery as a by-product of other processing, and to place that LCO into marketable form, Hess routinely blends LCO with CPL-54 jet fuel which results in the blend being able to be sold as #2 oil. (Unger Decl. Ex. 9, consisting of Black Tr. at 389, 415, 428, 507). The significance of the use of this cargo in the blending program is that it confirms that the mere act of combining the Tank 235 Cargo with the cargo already in Tank 235 rendered the whole lot CPL-54 grade rather soon after the cargo had arrived in New York and been discharged from the vessel.

### B.  The Tank 309 Cargo

On August 9, 2011, the Tank 309 Cargo was loaded on top of about 3,000 barrels of cargo pre- existing in that tank, resulting in a total of about 59,000 barrels being stored in Tank 309. Shortly after this, Hess transferred about 40,000 barrels to another tank designated for storage and use of CPL-54 grade jet, so-called Tank 7936, with the 40,000 barrels being added to jet fuel already in that tank. (*See* Unger Decl. Ex. 10, consisting of Hess Ex. 30 & 32 and Ammirati Tr. at 55-56). Thereafter, the approximate 40,000 barrels were sold[7] out of tank 7936 as CPL-54 grade jet. (Unger Decl. Ex. 11, consisting of Ammirati Tr. at 63, Hess Ex. 38 & 39 & Owner's Ex. Q).

With respect to the remainder in Tank 309, another parcel of approximately 50,000 barrels of jet fuel was shortly thereafter loaded on top , and the blended cargo was then sold as K1 jet fuel (an intermediate grade, higher than CPL-54). (Unger Decl. Ex. 12, consisting of

---

[7] See footnote 6, *supra*.

421772.1                                                    5

Owner's Ex. M, Hess Ex. 30, 33, 34 & 35). Consequently, as a result of merely blending the Tank 309 Cargo (which involves simply discharging cargo into storage tanks, an act which occurs in the ordinary course regardless of any alleged damage), the entire contaminated Tank 309 Cargo was sold as either CPL-54 or K1 grade.

### III. THE CLAIMS IN ARBITRATION

Hess initiated the New York arbitration claiming damages for the alleged downgrade in value of only the Tank 235 Cargo from CPL-55 grade to #2 oil. With respect to the Tank 309 Cargo, significantly, Hess had admitted that its mitigation efforts were successful, and hence no claim initially was presented for downgrade of that cargo. In particular, Hess advised:

> As advised, we understand that the product that went from SWARNA MALA to Hess Newark (approx. 60,000 bbl) was restored to marketable quality and sold as jet fuel, **thereby avoiding approximately $690,677 in downgrade losses.**

(Unger Ex. 13, including Owners Ex. 1) (emphasis added.) Consistent with this statement, Hess' original claim in the arbitration unequivocally stated as follows:

> 19. To mitigate its loss, Hess transferred the Jet parcel into its facilities at Newark and First Reserve in the hope of reconditioning it to a marketable grade. It was able to achieve this with respect to the approximately 57,000 barrels at Newark (which was upgraded and sold as Jet via Hess' Port Reading facility.

(Unger Ex. 14, including Hess original claim). Even Hess' witness admitted during the arbitration that Hess did not pursue a claim relative to the Tank 309 Cargo. (Unger Ex. 15, consisting of Ammirati Tr. at 201-210). However, on the eve of the arbitration hearings, Hess presented a new claim statement alleging, for the first time, damages for the <u>entire</u> Tank 309 Cargo based upon the market difference between #2 oil and CPL-55 grade jet. (Unger Decl. Ex. 16, consisting of Hess Ex. 21).

421772.1                                            6

In addition to its claims for cargo degradation, Hess sought recovery of the costs incurred in the mitigation effort including the costs to move the cargo from the vessel to Tank 235 and Tank 309, the costs to move the Tank 309 Cargo to tank 7936, and the costs to move the blended cargo in Tank 309 for the K-1 sale. (*See* Unger Decl. Ex. 3, Hess main brief at pp. 43-44).

## IV.  THE ARBITRATION

The arbitration panel consisted of Mr. Paul O'Brien, appointed by Dorado, Mr. Jack Berg, appointed by Hess, and Mr. Klaus Mordhorst serving as Chairman. Dorado admitted liability and hence the Panel's focus was on the issue of damages. (*See* Award p. 3).

The damages issues required the Panel to consider first the value of the cargo in an uncontaminated state. On this point, Hess had originally suggested that the uncontaminated jet fuel would have been of the highest grade of CPL-55, but the evidence showed that even before being loaded on the vessel (and hence before the contamination occurred), the cargo never met the CPL-55 specifications.[8] Hess thereafter asserted that the sound market value of the subject cargo would have been LS Jet/Kero, the intermediate grade jet fuel between CPL-55 and CPL-54 grades. The Panel eventually adopted this argument, finding that in an uncontaminated state the jet fuel cargo would have been of an intermediate grade" (*i.e.*, LS Jet/Kero" (*see* footnote 2, *supra*, describing the different grades of jet fuel). (*See* Award pp. 7 & 9).[9]

---

[8] The subject cargo was certified as CPL-54 grade jet fuel. *See infra* fn. 9.

[9] In adopting this value, the Panel accepted the unsupported testimony of a single Hess witness. (*See* Award at p. 7). However, notwithstanding that Hess, for several years, had received from Hovensa about six (6) vessels per month for years of the same type of jet fuel as involved here, there was no evidence that Hess had ever sold the Hovensa jet fuel product at the intermediate or highest value. Further, the specifications of the cargo as sold by Hovensa confirmed that the cargo was at best CPL-54 grade, and not the higher LS Jet/Kero grade. *See* Unger Decl. at Ex. 17, consisting of Hess Ex. 5 (the cargo "meets specifications CPL 54 Jet Fuel"); Ammirati Tr. at 35, 145 confirming that the cargo was purchased by Hess as CPL 54 grade jet. Dorado thus believes that the Panel's starting point for assessing damages (*i.e.*, the value of the cargo in an undamaged state) was wrong, but again does not challenge those findings here, recognizing that this issue was a factual one.

421772.1                                                    7

The Panel was also required to consider the cargo in its damaged condition upon arrival and Hess' mitigation efforts. On the value of the damaged cargo, the Panel accepted the unsupported testimony of Hess' witness that because Hovensa (the seller) would only have taken the cargo back as #2 oil, the damaged cargo was downgraded (in its entirety) to #2 oil. (Award p. 7). There was no notation whatsoever in Hess' own records confirming any such theoretical downgrade and the reality of the situation is that Hess' mitigation efforts resulted in the entire 112,289 barrels being sold or used as CPL-54 grade jet fuel. On mitigation, the Panel found that Hess "did take reasonable steps to mitigate the loss" and examined the mitigation expenses being sought by Hess. (Award pp. 7 & 10).

In the end, the Panel awarded Hess damages for the downgrade of the cargo based upon the difference between LS/Kero jet fuel (which it valued at CPL-55 grade pricing despite LS/Kero admittedly being a lesser grade fuel) and #2 oil and for a portion of the mitigation expenses claimed, all for a total of $963,805.98 (inclusive of interest). As explained herein, the Panel did not account for any of the proceeds received by Hess in its mitigation efforts, and in doing so disregarded fundamental principles of damages law.

## LEGAL DISCUSSION

Dorado recognizes that vacatur of arbitral awards is "extremely rare" and that the Panel's decision is entitled to great deference. *Cellu-Beep, Inc. v. TeleCorp Communs., Inc.*, 13 Civ. 7236 (NRB), 2014 U.S. Dist. LEXIS 98037, *5 (S.D.N.Y. July 17, 2014). Yet, this is precisely the case that warrants the Court's intervention to prevent the unjust result of the Award and to protect the integrity of the U.S. arbitral process.

I.  **DORADO'S APPLICATION TO VACATE THE AWARD AND HESS'S APPLICATION TO CONFIRM THE AWARD ARE GOVERNED BY THE FAA.**

The Award was issued in New York and involved a foreign party (Dorado) and a U.S. domestic entity (Hess). As such, and even though the arbitration was held in the U.S., the case is subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the Convention), 9 U.S.C. §§ 201-208. *See* 9 U.S.C. §202 (making Convention applicable to claims involving one or more foreign participants). The Convention incorporates the provisions of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 *et seq.* (the "FAA"), to the extent the FAA is not inconsistent or in conflict with the Convention. *Id.* at §208.

Under the Convention, a distinction is drawn between awards rendered in the U.S. involving a foreign party (such as the case here) and awards rendered abroad. In the case of the former, the Second Circuit has determined that the Convention specifically contemplates that a U.S. court will be free to set aside or modify an award in accordance with U.S. "domestic arbitral law and its full panoply of express and implied grounds for relief." *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" US, Inc.*, 126 F.3d 15, 24 (2d Cir. 1997). Accordingly, when it comes to confirming or vacating a New York award subject to the Convention, the FAA's express and implied grounds for vacatur, as well as applicable local domestic arbitral law, are applied. *See id.* at 24-25.

Section 10(a) of the FAA sets forth express statutory grounds for vacatur, and in addition to these express grounds, there is an implied basis for vacatur when an award is in "manifest disregard" of applicable law. *NYKCool A.B. v. Pac. Fruit, Inc.*, 507 Fed. App'x 83, 85-86 (2d Cir. 2013) (quoting *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339-40 (2d

Cir. 2010)).[10]   A reviewing court may vacate an award for manifest disregard of the law if it finds both that "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Wallace v. Buttar*, 378 F.3d 182, 189-90 (2d Cir. 2004).  The use of manifest disregard of the law is admittedly limited to those rare instances where some egregious impropriety on the arbitrators' part is apparent, but where none of the FAA's express grounds for vacatur apply.  *See Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 388 (2d Cir. 2003).  This case presents such a situation.

## II. THE AWARD WAS RENDERED IN MANIFEST DISREGARD OF THE ESTABLISHED LAW ON DAMAGES WHICH PROHIBITS A PARTY FROM RECEIVING A WINDFALL AND REQUIRES THAT THE FRUITS OF REASONABLE MITIGATION EFFORTS BE ACCOUNTED FOR IN THE DAMAGE CALCULATION.

### A.   The Law on Damages in a COGSA Case is Well-Defined, Explicit, and Clearly Applicable

Liability in this case was conceded, leaving only the issues of damage for the Panel's review.  The applicable law on damages is settled, well-defined and explicit.

Hess' claims for damage were governed by U.S. COGSA, and under COGSA, the general measure of recoverable damages is "the difference between the fair market value of the goods at their destination in the condition they did arrive and the fair market value in the condition in which they actually did arrive" (the so-called "Market Rule"). *Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli*, 814 F.2d 115, 118 (2d Cir. 1987).  This rule of damages is, however, tempered by the fact that a plaintiff is only entitled to recover its actual loss and "[t]he

---

[10] While there was some question about whether "manifest disregard of the law" survived the Supreme Court's decision in *Hall Street Assocs. L.L.C. v. Mattel, Inc.*, 128 S.Ct. 1396 (2008), that Court in *Stolt-Nielsen*, 130 S. Ct. 1758 (2010), and the Second Circuit in *Jock v. Sterling Jewelers Inc.*, 2011 U.S. App. LEXIS 13633, at *21-22 (2d Cir. July 1, 2011), have since clarified its continued validity.

carrier is never liable for damages other than those that accurately represent the shipper's "actual loss sustained." *Id.* at 118.

Furthermore, the damages recoverable in a case governed by COGSA are limited by the ordinary principles of contract law which equally apply in COGSA cases. *M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103, 1112 (2d Cir. 1985). One of the most fundamental principles of contract law is that a plaintiff is not entitled to receive a windfall. An injured party also has an affirmative duty to mitigate its damages. *Golodetz*, 751 F.2d 1103,1112 (2d Cir. 1985); *see also Hale Container Line, Inc. v. Houston Sea Packing Co.*, 137 F.3d 1455 (11th Cir. 1998) (stating that a plaintiff in a COGSA action has a general duty to mitigate damages); *Marine Office of America Corp. v. Lilac Marine Corp.*, 296 F. Supp.2d 91 (D. P.R. 2003) (highlighting injured shipper's efforts to mitigate its damages); *Shonac Corp. v. Maersk, Inc.*, 159 F. Supp.2d 1020 (S.D. Oh. 2001) (recognizing shipper's duty to mitigate its damages); *Sogem-Afrimet, Inc. v. M/V Ikan Selayang*, 951 F. Supp. 429 (S.D.N.Y. 1996) (noting that a plaintiff in a COGSA action "is always under a duty to reasonably mitigate the damages it sustains"). Consequently, to ensure adherence to the fundamental principle of compensating a plaintiff only for the actual loss sustained and a balance between a plaintiff's duty to mitigate and its right to a fair recovery, the law requires consideration of any mitigation efforts undertaken by a plaintiff (or that should have been taken) in response to a loss and the net proceeds resulting from same (*i.e.*, the revenue generated from same less the expenses incurred in mitigating) or the net proceeds that should have resulted if the plaintiff fails to mitigate.

### B.  The Arbitrators Knew of the Governing Damage Law Principles Yet Refused to Apply Them or Ignored Them Altogether.

There can be no dispute that the Panel was aware of the governing legal principles on damages, including the concept of mitigation. These principles were discussed in the briefs

submitted by both Dorado and by Hess. (*See* Unger Decl. at Ex. 2, Dorado's main brief at pp. 11-12, 15; Ex. 3, Hess' main brief at pp. 44-45; & Ex. 4, Dorado's reply brief at pp. 15). Further, the Panel specifically found that Hess took reasonable steps to mitigate the loss, (Award at p. 7), and awarded Hess a portion of the barge costs incurred by Hess in mitigating the loss (Award at p. 10). Consequently, there can be no dispute that the Panel was aware of the applicable law and considered mitigation.

It is equally clear that the Panel refused to apply the governing law or ignored it insofar as they failed to take into account any of the proceeds from the mitigation efforts undertaken by Hess and hence did not reduce Hess' damages to account for mitigation. First, the Panel simply failed to account for the fact that Hess <u>admitted</u> that the full extent of the Tank 309 Cargo had been reconditioned and was not to be the subject of a claim. Secondly, and putting aside this admission of no damages in respect to any of the Tank 309 Cargo, the Panel did not account for the fact that 40,000 barrels of the Tank 309 Cargo had been transferred to Tank 7936 and Hess separately <u>admitted</u> there was no claim on these barrels. Thirdly, the Panel did not account for the proceeds of the mitigation efforts in respect to the 25,027 barrels from Tank 235 which Hess <u>admittedly</u> sold as CPL-54 grade jet fuel.

As explained above, even accepting that the subject cargo in an undamaged state would have had a value equivalent to an intermediate grade of jet fuel (*i.e.*, LS Jet/Kero), through its blending efforts (the expenses for which Hess was able to recover), Hess was able to sell or utilize all of the cargo as CPL-54 (and/or sold as Kero 1). The Panel did not take this into account when assessing Hess' damages based on the delta between LS Jet/Kero and #2 oil and on the expenses incurred in mitigation.[11] The failure to consider any of the mitigation proceeds,

---

[11] The Panel did note that Hess' damages could not be limited purely to the costs incurred by Hess in reconditioning the cargo and that the fact that some of the cargo was fully restored did not constitute a "special circumstance"

421772.1                           12

particularly while at the same time finding that Hess reasonably mitigated and awarding it some of its mitigation expenses, demonstrates a manifest disregard of the law on damages and results in a windfall being given to Hess. The Award of $963,805.98 in Hess' favor should be vacated.

## CONCLUSION

Based on the foregoing, the Award should be vacated and Dorado awarded any and all other relief, including but not limited to its attorneys' fees incurred in these proceedings.

Dated: New York, New York.
September 12, 2014

                                FREEHILL HOGAN & MAHAR, LLP
                                Attorneys for Respondent
                                DORADO TANKERS POOL, INC.

                                _____
                                Michael E. Unger
                                80 Pine Street
                                New York, NY 10005
                                (212) 425-1900
                                unger@freehill.com

---

allowing the Panel to limit Hess' damages to the incident costs (which was one of Dorado's arguments). (*See* Award pp. 5, 8-9). But the Panel disregarded or ignored that the proceeds of the mitigation effort should have acted as an offset of Hess' damages that were calculated based upon the delta between LS Jet/Kero and #2 oil, even if those net proceeds may not have triggered a limitation of Hess' damages to only remediation costs.

421772.1                                              13

## CERTIFICATE OF SERVICE

   I hereby certify that on September 12, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will automatically send email notification of such filing to all attorneys of record. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the below service list in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notice of Electronic Filing.
Ex

**VIA ECF & EMAIL**

James Kleiner
Hill, Betts & Nash, LLP
One World Financial Center
200 Liberty Street
New York, NY 10281-1003
*Attorneys for Petitioner*

_____
Michael E. Unger