UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In the matter of the Arbitration

Between

HESS CORPORATION,                                **MEMORANDUM AND ORDER**

                    Petitioner,                   14 Civ. 6412 (NRB)

          - and -

DORADO TANKER POOL, INC.,

                    Respondent.
----------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Petitioner Hess Corporation ("Hess") petitions to confirm an arbitration award of $1,192,021.25 in its favor and against respondent Dorado Tanker Pool, Inc. ("Dorado").  Dorado opposes the petition and moves to vacate the award on the ground that it reflects manifest disregard of the law of damages.  For the reasons stated herein, we conclude that there was no manifest disregard of the law, and we confirm the award.

## I.    BACKGROUND[1]

Dorado does not dispute the arbitration panel's factual findings for present purposes.  Accordingly, we rely on those factual findings, supplemented only as necessary to illuminate the parties' current dispute.

### A.    Underlying Facts

This case arises out of the contamination of a parcel of jet fuel belonging to Hess at the port of St. Croix, U.S. Virgin Islands.  On July 30, 2011, the M/T SWARNA MALA (the "Vessel") arrived at St. Croix, pursuant to a charter party between Hess and Dorado, the Vessel's time charter owner, to take on two cargoes of clean petroleum products sold there by Hovensa LLC ("Hovensa") to Hess.  Award at 2.  The Vessel's initial orders were to carry the cargoes to Bayonne, New Jersey, but revised orders providing for final discharge at other United States and Canadian ports were contemplated.  Id.  One of the cargoes was

---

[1] We refer to Hess's Petition dated August 12, 2014, Doc. 7 ("Pet."); the Final Award of the arbitration panel, dated July 23, 2014, Ex. 1 to the August 12, 2014 declaration of James D. Kleiner, Esq., Doc. 8 ("Award"); Dorado's memorandum of law dated September 12, 2014, Doc. 14 ("Dorado Mem."); Hess's reply memorandum of law dated October 3, 2014, Doc. 20 ("Hess Reply Mem."); the declaration of James D. Kleiner, Esq., dated October 3, 2014, Doc. 21 ("Kleiner Reply Decl."), and exhibits thereto; and Dorado's memorandum of law dated October 15, 2014, Doc. 24 ("Dorado Reply Mem."). We also refer to the post-hearing briefs submitted in arbitration, which are exhibits to the September 12, 2014 declaration of Michael E. Unger, Esq., Doc. 19 ("Unger Decl."), specifically Hess's main brief dated September 6, 2013, Unger Decl. Ex. 3 ("Hess Post-Hearing Br."); Dorado's main brief dated September 6, 2013, Unger Decl. Ex. 2 ("Dorado Post-Hearing Br."); and Dorado's reply brief dated October 21, 2013, Unger Decl. Ex. 4 ("Dorado Post-Hearing Reply Br.").

jet fuel, and the other was No. 2 heating oil (or "No. 2 oil"), a product of lower grade than jet fuel.  Id.  The quantity of jet fuel sold by Hovensa to Hess was 112,289.69 barrels ("bbl").[2] Id. at 9.

The next day, after the cargoes were loaded on board the Vessel, independent inspectors discovered discrepancies suggesting that a portion of the No. 2 oil had been erroneously transferred into the tank containing the jet fuel.  Award at 2. A comparison between land and ship tank cargo measurements revealed a gain of 3,812.62 bbl in the tanks designated for jet fuel and a corresponding shortage of 3,007.80 bbl in the tanks designated for No. 2 oil.  Id.  Apparently, the jet fuel had been contaminated in loading.  Id.

Hovensa refused a request to take the apparently contaminated product back ashore.  Id.  Hess revised its voyage orders and directed the Vessel to proceed to New York harbor, where it arrived on Saturday, August 6, 2011.  Id. at 2-4.  The arbitration panel summarized the events that transpired after the Vessel arrived in New York as follows:

> Following sampling at the anchorage, the Vessel discharged the contaminated jet fuel parcel into two barges which in turn delivered the product ashore into Hess Newark Tank 309 and its First Reserve Tank 235. From those tanks Hess subsequently moved the product about to other of its tanks and through a myriad of barge transfers, product blends and sales in an

---

[2] A barrel of oil is equivalent to 42 gallons.

attempt to mitigate its damages.  The damaged product
was ultimately disposed of some three months later.

Id. at 3.


**B.  The Arbitration**

Hess commenced two proceedings to recover for loss that it
claimed to have incurred as a result of the contamination of the
jet fuel parcel (hereafter called the "Contaminated Fuel").  The
first, a civil action in this Court against the Vessel and its
owner, was stayed pending the arbitration of Hess's claim
against Dorado.  See Stipulation and Order, Hess Corp. v.
Shipping Corp. of India Ltd., No. 12 Civ. 6037 (NRB) (S.D.N.Y.
Jan. 16, 2013), Doc. 5.  The second was the arbitration between
Hess and Dorado that resulted in the award now under review.

The arbitration was conducted in New York before a panel of
three arbitrators (the "Panel").  Award at 3.  Because Dorado
conceded liability for the contamination of the jet fuel at St.
Croix, id., the principal issue before the Panel was to
determine the amount of damages.  The Panel conducted six
evidentiary hearings, in which it heard the testimony of three
witnesses and received voluminous documentary evidence.  Id.  In
a reasoned decision of thirteen pages, exclusive of an appendix,
the Panel awarded some but not all of Hess's claimed damages and
also granted a Dorado counterclaim.

In its post-hearing briefing, Hess asked the Panel to find that it incurred three categories of damages.  The arguments of the parties as to each of these categories, and the conclusions of the Panel, may be summarized as follows.

### 1.  Downgrade of the Contaminated Fuel

Hess's principal damages claim was for the diminution in value, or downgrading, of the Contaminated Fuel caused by the contamination itself.  Hess argued that the Panel should calculate this loss according to the "market value rule," defined as "the difference between the sound and damaged market values of the jet product . . . . at the time of delivery." Award at 4-5; see, e.g., Hess Post-Hearing Br. at 2-3, 38-40. Applying that rule, Hess argued that the Contaminated Fuel's sound market value (i.e., the value that it would have had if it had not been contaminated) would have been that of "low sulfur jet/kerosene"; that the damaged market value of the Contaminated Fuel was that of No. 2 oil; and that the appropriate values for each of these grades of fuel were the market prices published by Platts for August 5, 2011 (the last business day before the Vessel arrived at New York), viz., $3.1091 per gallon ("gal") for low sulfur jet/kerosene and $2.9361 per gallon for No. 2 oil.  Award at 3-4.  Based on the $0.173/gal price difference,

Hess argued that the downgrade of 112,289.69 bbl of Contaminated Fuel cost it $815,896.87. Id. at 9.

In response, Dorado argued that "Hess sustained no loss from the contamination" whatsoever. Award at 5; see, e.g., Dorado Post-Hearing Br. at 1. Specifically, Dorado argued that the evidence showed that when Hess purchased the Contaminated Fuel, that fuel "met the specifications for CPL 54 grade jet," and that all of the Contaminated Fuel was ultimately either "sold or otherwise utilized by Hess as CPL 54 grade jet" and thus "was never simply downgraded to 2 oil." Dorado Post-Hearing Br. at 3; see Award at 5.[3] Dorado argued that instead of calculating damages according to the market value rule urged by Hess, the Panel should instead apply the "remediation rule," Dorado Post-Hearing Br. at 15, under which "any damages awarded to Hess must only reflect the costs incurred by Hess in reconditioning the allegedly contaminated fuel," id. at 17. Dorado further argued that "Hess has failed to provide such costs." Id.

The Panel accepted Hess's arguments, finding that the Contaminated Fuel had the "quality parameters of a low sulfur jet/kerosene" in its sound condition and the value of No. 2 oil in its distressed condition. Award at 9; see id. at 7.

---

[3] CPL-54 is a lower grade product than low sulfur jet/kerosene, but is a higher grade than No. 2 oil. Dorado Mem. at 7.

Emphasizing the availability of "a published market reference for the goods" (i.e., the Platts prices), and rejecting Dorado's contention that special circumstances justified a departure from the market value rule, the Panel concluded that "the appropriate measure of damages in this case is the difference between the fair market value of the cargo at its destination in the condition in which it should have arrived and the fair market value in the condition in which it actually did arrive." Id. at 7-8. Accordingly, the Panel awarded $815,896.87 for the downgrade of the jet fuel. Id. at 9.

**2. Alleged Downgrade of the Tank 235 Cargo**

Hess's second damages claim related to the discharge of a portion of the Contaminated Fuel into a shore tank in Hess's Newark, New Jersey facility ("Tank 235"). As noted above, after the Vessel arrived in New York harbor, it discharged the Contaminated Fuel into two barges. Award at 3. One of the barges, "Barge RTC-60," delivered about half of the Contaminated Fuel to Tank 235, where it was loaded on top of a pre-existing cargo of roughly 68,900 bbl (the "Pre-Existing Cargo"). Dorado Mem. at 4; Hess Reply Mem. at 11, 13.

Hess argued that the Pre-Existing Cargo was grade CPL-54, and that a portion of the blend that resulted from the Vessel's cargo being loaded on top of the Pre-Existing Cargo was

unmarketable as CPL-54 and instead was reduced to the value of No. 2 oil.  Hess Post-Hearing Br. at 28-29, 43.  Hess argued that this downgrade caused a loss of $149,710.54.  Id. at 43. Dorado responded that the Pre-Existing Cargo was already "off-spec" for CPL-54 and that, after the Contaminated Fuel was loaded on top, the entire contents of Tank 235 became "on-spec" for CPL-54.  Dorado Post-Hearing Reply Br. at 10.  Accordingly, Dorado denied that the Pre-Existing Cargo had been downgraded and argued that no damages were warranted in respect of the Pre-Existing Cargo.  Indeed, Dorado postulated that it should receive a "credit for fixing the pre-existing cargo in tank 235." Id. at 27 (emphasis omitted).

The Panel denied Hess's claim for damages to the Pre-Existing Cargo, finding that it "was already 'off spec' and became more marketable as a result of the Vessel's cargo being loaded on top." Award at 9.  However, the Panel did not accept Dorado's invitation to credit the value of the supposed upgrade of the Pre-Existing Cargo against Dorado's other liability.

### 3.  Ancillary Losses

Finally, Hess claimed what it described as "other ancillary losses." Hess Post-Hearing Br. at 3; see Award at 4.  These comprised:  (1) the costs of the two barge trips that moved the Contaminated Fuel from the Vessel to shore and of two subsequent

barge trips; (2) tankage costs; (3) inspection costs; and (4) spill taxes.   Hess Post-Hearing Br. at 43-44; <u>see</u> Award at 4, 10.   Dorado conceded that the cost of two of the barge movements were "recoverable in mitigation," but opposed the other two. Dorado Post-Hearing Reply Br. at 28.   Dorado also opposed the tankage costs but conceded its liability for the inspection costs and for half of the claimed spill tax.   <u>Id.</u>

The Panel denied the tankage fees and awarded one-half of both the inspection costs and the spill taxes.   Award at 10. The Panel also awarded part of the barging costs, explaining:

> Hess claims it is entitled to recover a total of $168,342.82 in barging costs it would not have incurred but for the mitigation efforts to remedy the effects of the contamination.   Some barging occurred some three months after this incident; another movement would likely have taken place regardless of the contamination; and a third movement involved transport of a panel of cargo made more valuable by the mitigation efforts.   The Panel, accordingly, finds that a portion of these costs are recoverable but other portions are not.   Total allowed: $48,101.02.

<u>Id.</u> (underlining in original).   From a comparison of the parties' post-hearing briefing to the amount awarded, it is clear that the $48,101.02 awarded for barging costs corresponds to the cost of the movement of Barge RTC-103, which transported part of the Contaminated Fuel from the Vessel to Tank 309.   <u>See</u> Hess Post-Hearing Br. at 43-44; Dorado Post-Hearing Reply Br. at 28.   In other words, the Panel declined to award the claimed

costs of the other three barge movements, including that of Barge RTC-60 from the Vessel to Tank 235.


### 4. The Final Award

In total, the Panel awarded Hess $883,063.24 in "damages attributable to contamination," of which $815,896.87 was for the downgrade of the Vessel's cargo, $48,101.02 was for barging costs, and a total of $19,065.35 was for inspection costs and spill tax. Award at 9-11. The Panel also awarded Hess interest and partial allowances for its legal fees and costs and the arbitrators' fees, resulting in a total award of $1,192,021.25. Id. at 11-12.[4]


### C. Post-Arbitration Proceedings

On August 12, 2014, Hess petitioned this Court to confirm the Award pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517 (1970) (the "New York Convention" or the "Convention") and its implementing legislation, 9 U.S.C. § 201 et seq. The action was accepted by the undersigned as related to Hess's earlier-filed civil action against the Vessel and its

---

[4] The Panel also awarded Dorado $62,211.12 on a counterclaim, which Hess has satisfied and which is not relevant here. Award at 11-12; Hess Reply Mem. at 1; Kleiner Reply Decl. Ex. 1.

owner.    On  September  15,  2014,  Dorado  interposed  a  motion  to
vacate  the  Award  pursuant  to  the  same  statutes.    The  respective
positions  of  the  parties  were  fully  briefed  on  October  15,  2014.
Oral  argument  was  held  on  February  2,  2015.


## II.  DISCUSSION

Dorado's  sole  challenge  to  the  Award  is  that  it  reflects
manifest  disregard  of  the  law  of  damages.


## A.  Jurisdiction

The   FAA   does   not   by   itself   confer   subject-matter
jurisdiction  on  the  federal  courts  to  entertain  actions  to
confirm  or  vacate  an  arbitration  award.    Scandinavian
Reinsurance  Co.  v.  St.  Paul  Fire  &  Marine  Ins.  Co., 668  F.3d  60,
71  (2d  Cir.  2012).    Thus,  "[t]here  must  be  an  independent  basis
of  jurisdiction  before  a  district  court  may  entertain  petitions
under  the  [FAA]."    Harry  Hoffman  Printing,  Inc.  v.  Graphic
Commc'ns,  Int'l  Union,  Local  261,  912  F.2d  608,  611  (2d  Cir.
1990).    Here,  the  Court  has  at  least  two  independent  bases  of
jurisdiction.

First,   admiralty   jurisdiction   lies   under   28   U.S.C.
§ 1333(1) because  the  agreement  to  arbitrate  was  part  of  the
charter  party -- a  quintessentially  maritime  contract -- between
Hess  and  Dorado.    See  Am.  Bureau  of  Shipping  v.  Tencara  Shipyard

S.P.A., 170 F.3d 349, 352 (2d Cir. 1999) (finding subject matter jurisdiction pursuant to § 1333 over petition to compel arbitration under a maritime contract); C.T. Shipping, Ltd. v. DMI (U.S.A.) Ltd., 774 F. Supp. 146, 148 (S.D.N.Y. 1991) (finding jurisdiction over petitions to confirm and vacate arbitration award arising out of time charter party under § 1333 "[b]ecause of the maritime subject matter of the case").

Second, Hess's petition and Dorado's motion come within the scope of the New York Convention, whose implementing legislation provides for federal subject-matter jurisdiction. 9 U.S.C. § 203; Scandinavian Reinsurance, 668 F.3d at 71. By its own terms, the New York Convention applies to "the recognition and enforcement of . . . . arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought." New York Convention, art. I(1).[5] The Second Circuit has construed the scope of "awards not considered as domestic awards" broadly, explaining that such awards are those "made within the legal framework of another country, e.g., pronounced in accordance with foreign law or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction." Bergesen v. Joseph Muller Corp.,

---

[5] The Convention also applies to "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." New York Convention, art. I(1). Here, as the Award was made in New York, there is no such territorial basis for applying the Convention.

710 F.2d 928, 932 (2d Cir. 1983).  The Second Circuit has also approvingly quoted the Seventh Circuit's view that "any commercial arbitral agreement, unless it is between two United States citizens, involves property located in the United States, and has no reasonable relationship with one or more foreign states, falls under the Convention."  Jain v. de Méré, 51 F.3d 686, 689 (7th Cir. 1995), quoted in Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc., 126 F.3d 15, 19 (2d Cir. 1997) ("Alghanim").[6]

Here, although the underlying incidents took place in United States ports, the arbitration took place in the United States, the law applied in the arbitration was United States law, and Hess is a United States corporation, Dorado is a foreign corporation incorporated in the Marshall Islands.  Pet. ¶¶ 8-9; see Dorado Mem. at 9.  Under Alghanim and Jain, the fact that one of the parties to the arbitration is a foreign corporation suffices to bring the Award within the scope of the New York Convention, and thus to provide an alternative basis of subject-matter jurisdiction.

---

[6] The Second Circuit continues to rely on Jain for this proposition. See, e.g., Agility Pub. Warehousing Co. K.S.C. v. Supreme Foodservice GmbH, 495 F. App'x 149, 151 (2d Cir. 2012) (summary order).

**B.    The "Manifest Disregard" Standard**

Under both the FAA and the New York Convention, a court must grant a proper petition to confirm an arbitration award unless there are grounds to vacate, modify, or correct it.   9 U.S.C. §§ 9, 207.   One of the few grounds for vacating an award under the FAA is that the award "was rendered in manifest disregard of the law."   Schwartz v. Merrill Lynch & Co., 665 F.3d 444, 451 (2d Cir. 2011) (internal quotation marks omitted). Manifest disregard of the law is similarly a ground to decline to enforce an arbitration award under the New York Convention where, as here, the award was rendered in the United States. Alghanim, 126 F.3d at 23.

The party challenging an arbitration award on the basis of manifest disregard of the law bears a "heavy burden."   GMS Group, LLC v. Benderson, 326 F.3d 75, 81 (2d Cir. 2003). Manifest disregard requires "more than a simple error in law or a failure by the arbitrators to understand or apply it" and likewise "more than an erroneous interpretation of the law." Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S, 333 F.3d 383, 389 (2d Cir. 2003).   Indeed, manifest disregard will be found "only in the most egregious instances of misapplication of legal principles," Wallace v. Buttar, 378 F.3d 182, 190 (2d Cir. 2004), that is, where "a party clearly demonstrates 'that the panel intentionally defied the law,'" STMicroelectronics,

N.V. v. Credit Suisse Securities (USA) LLC, 648 F.3d 68, 78 (2d
Cir. 2011) (quoting Duferco, 333 F.3d at 393).

     To demonstrate manifest disregard, the party resisting the
arbitration award must establish that "the governing law alleged
to have been ignored by the arbitrators was well defined,
explicit, and clearly applicable," and that "[t]he arbitrator[s]
. . . appreciate[d] the existence of a clearly governing legal
principle but decide[d] to ignore or pay no attention to it."
Westerbeke Corp. v. Dihatsu Motor Co., 304 F.3d 200, 209 (2d
Cir. 2002) (internal quotation marks and other brackets
omitted).   Thus, "manifest disregard can be established only
where a [well defined, explicit, and clearly applicable]
governing legal principle . . . [was] ignored . . . after it was
brought to the arbitrator's attention in a way that assures that
the arbitrator knew its controlling nature."   Goldman v.
Architectural Iron Co., 306 F.3d 1214, 1216 (2d Cir. 2002)
(internal quotation marks omitted).

     The party resisting the award must also show "that the law
was in fact improperly applied, leading to an erroneous
outcome." Duferco, 333 F.3d at 390; see, e.g., T.Co Metals, LLC
v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339 (2d Cir.
2010).   Accordingly, "[e]ven where explanation for an award is
deficient or non-existent, we will confirm it if a justifiable
ground for the decision can be inferred from the facts of the

15

case." Duferco, 333 F.3d at 390. And "where an arbitral award contains more than one plausible reading, manifest disregard cannot be found if at least one of the readings yields a legally correct justification for the outcome." Id.


**C.   Damages in Maritime Cargo Damage Cases**

The general principles applicable to the calculation of damages in maritime cargo damage cases are the same as those applicable in ordinary contract cases. See, e.g., M. Golodetz Export Corp. v. S/S Lake Anja, 751 F.2d 1103, 1112 (2d Cir. 1985). "[I]n keeping with the common law, the primary object in awarding damages . . . is to indemnify the plaintiff for the loss sustained by reason of the carrier's fault." Valerina Fashions, Inc. v. Hellman Int'l Forwarders, Inc., 897 F. Supp. 138, 140 (S.D.N.Y. 1995). Thus, damages are limited by the so-called "duty to mitigate," which represents "the principle that 'damages which the plaintiff might have avoided with reasonable effort . . . are . . . not caused by the defendant's wrong . . . and, therefore, are not to be charged against him.'" M. Golodetz, 751 F.2d at 1112 (quoting 2 Williston on Contracts § 1353, at 274 (1962)).

Under the ordinary rule of damages, known as the market value rule, "the measure of damages is the difference between the fair market value of the goods at their destination in the

condition in which they should have arrived and the fair market value in the condition in which they actually did arrive." Kanematsu-Gosho Ltd. v. M/T Messiniaki Aigli, 814 F.2d 115, 118 (2d Cir. 1987). However, this market value rule is "at best but a convenient means of getting at the loss suffered," id. at 119 (quoting Ill. Cent. R.R. Co. v. Crail, 281 U.S. 57, 64 (1930)), and "not a hard and fast rule," Texport Oil Co. v. M/V Amolyntos, 11 F.3d 361, 365 (2d Cir. 1993), overruled on other grounds as recognized by Farrell Lines Inc. v. Ceres Terminals Inc., 161 F.3d 115, 117 (2d Cir. 1998). Therefore, "[w]hen circumstances suggest a more appropriate alternative, the fair market [value] test may be superseded by another method of calculating damages." Texport Oil, 11 F.3d at 365.

One such alternative is the so-called "reconditioning cost" or "remediation cost" rule. Under this rule, where "reconditioning of the damaged merchandise is feasible . . . . at a modest cost so that the shipper realizes the market value of the product, the courts sometimes limit damages to [the] reconditioning costs." Santiago v. Sea-Land Serv., Inc., 366 F. Supp. 1309, 1315 (D.P.R. 1973). The appropriateness of abandoning the market value rule for the cost of reconditioning depends upon the facts, and available evidence, of each case. Compare Weirton Steel Co. v. Isbrandtsen-Moller Co., 126 F.2d 593, 594-95 (2d Cir. 1942) (L. Hand, J.) (applying

17

reconditioning cost rule), and Texport Oil, 11 F.3d at 365 (same), with Thyssen, Inc. v. S.S. Fortune Star, 777 F.2d 57, 61-62 (2d Cir. 1985) (Friendly, J.) (declining to apply reconditioning cost rule), and Thyssen, Inc. v. S/S Eurounity, 21 F.3d 533, 540 (2d Cir. 1994) (same).

In addition to the value assigned to the direct damage to the cargo itself, the shipper may recover for reasonable incidental damages (such as the costs of surveys, inspections, salvage handling, necessary transportation and the like) resulting from the cargo damage. See, e.g., Fortis Corp. Ins., S.A. v. M/V Cielo del Canada, 320 F. Supp. 2d 95, 108 & n.8 (S.D.N.Y. 2004); Marine Office of Am. Corp. v. Lilac Marine Corp., 296 F. Supp. 2d 91, 107 (D.P.R. 2003); Hartford Fire Ins. Co. v. Novocargo USA Inc., 257 F. Supp. 2d 665, 677 (S.D.N.Y. 2003); Plywood Panels, Inc. v. M/V Sun Valley, 804 F. Supp. 804, 813-14 (E.D. Va. 1992), aff'd sub nom. Plywood Panels, Inc. v. Hyundai Merch. Marine Co., 4 F.3d 986 (4th Cir. 1993); Amstar Corp. v. M/V Alexandros T., 472 F. Supp. 1289, 1295 (D. Md. 1979), aff'd, 664 F.2d 904 (4th Cir. 1981). Such "necessary expenses incidental to the loss sustained" are recoverable "[i]n addition to the actual loss of market value involved" "if they were reasonably considered necessary at the time they were incurred." Santiago, 366 F. Supp. at 1317.

**D.   Dorado's Challenge to the Award**

Dorado challenges the Award on the ground that the Panel manifestly disregarded the law of damages by "award[ing] Hess expenses incurred in mitigating the loss" to its cargo while "completely disregard[ing] any of the revenue and benefits received by Hess from its mitigation efforts," thus "compensating Hess far beyond the actual loss" and giving Hess a "windfall." Dorado Mem. at 2. Dorado argues that in doing so, the Panel ignored Hess's duty to mitigate and contravened the "fundamental principle of compensating a plaintiff only for the actual loss sustained." Id. at 11.

Dorado's argument is narrowly circumscribed. Dorado does not challenge the Panel's factual findings. Id. at 2. Also, although in the arbitration Dorado vigorously argued that the Panel should apply the remediation cost rule, Dorado now "does not contest the Panel's decision to apply the market value rule of damages." Dorado Reply Mem. at 5. Accordingly, Dorado must accept that the starting point for calculation of damages is the diminution in market value of the Contaminated Fuel, which the Panel found to be $815,896.87.

Dorado argues that the Panel misapplied the market value rule because "even when the [market value rule of damages] is applied, the law requires consideration of the mitigation efforts beyond the point of delivery." Dorado Reply Mem. at 5.

In other words, "the law requires consideration of any
mitigation efforts undertaken by a plaintiff (or that should
have been taken) in response to a loss and the net proceeds
resulting from same (i.e., the revenue generated from same less
the expenses incurred in mitigating) or the net proceeds that
should have resulted if the plaintiff fails to mitigate."
Dorado Mem. at 11. Applied here, this would mean that the Panel
should have subtracted from Hess's damages the net proceeds of
what the Panel described as Hess's "attempt to mitigate its
damages" by "mov[ing] the product about to other of its tanks
and through a myriad of barge transfers, product blends and
sales," Award at 3.

    In this context of a challenge to an arbitration award,
this argument has at least two fatal flaws. First, Dorado does
not argue that it presented this view of the operation of the
market value rule to the Panel, and our review of the post-
hearing briefs reveals that it did not. Dorado instead argued
that "the fair market value test is an inappropriate method of
calculating damages," Dorado Post-Hearing Br. at 15, and that
the "Panel should calculate any damages based upon the
'remediation rule' test," id. at 17. Dorado never argued in the
alternative that, if the market value rule were applied, its
result should be adjusted based on the costs and benefits of
Hess's mitigation efforts. Indeed, Dorado's explanation of the

market value rule was nearly identical to Hess's explanation.
Compare Dorado Post-Hearing Br. at 11, 15 (quoting Kanematsu-
Gosho Ltd., 814 F.2d at 118), with Hess Post-Hearing Br. at 40
(quoting Kanematsu-Gosho Ltd., 814 F.2d at 118).   As the
supposed rule on which Dorado now relies was never "brought to
the arbitrator[s'] attention," it cannot be a basis to refuse to
confirm the Award.   Goldman, 306 F.3d at 1216.[7]

Second and more importantly, Dorado's argument
mischaracterizes the relationship between the market value rule
and the duty to mitigate.   An implicit premise of the market
value rule is that the injured party's duty to mitigate would
have been satisfied by selling the distressed goods upon receipt
for fair market value.   Thus, where the market value rule is
applicable, the shipper's efforts, if any, to recondition the
distressed goods rather than reselling them immediately are
irrelevant to the computation of direct damages.   As the Panel
correctly explained, "[b]ecause the market value rule considers
the diminished value of the cargo on the date of discharge,
later price fluctuations or changes in value beyond the date of

---

[7] Dorado did argue that "even if the cargo is unable to be fully
restored and is sold or valued at a discount, that discount must be offset
from the market value when calculating damages."   Dorado Post-Hearing Reply
Br. at 16.   But this is simply a restatement of the market value rule, with
the (correct but irrelevant) nuance that under some circumstances, such as
when there is no published market price but there is a bona fide salvage
sale, the actual sale price of the distressed cargo may best demonstrate its
damaged market value.   It is not an argument that the result of the market
value rule should be further adjusted based upon the plaintiff's later
mitigation efforts.

discharge <u>are irrelevant</u> to [the] damages calculation." Award
at 8 (quoting <u>BP N. Am. Petroleum v. SOLAR ST</u>, 250 F.3d 307, 314
(5th Cir. 2001)) (emphasis in Award).[8]

Dorado also argues that the Panel's decision was
inconsistent in that it awarded to Hess part of the cost of
reconditioning the Contaminated Fuel, and thus should have
awarded at least part of the benefits that Hess derived from
this mitigation effort. Dorado Reply Mem. at 5. The flaw in
this argument is that, even assuming that it rests on a
plausible characterization of the Award, there is a more
plausible characterization that is not inconsistent and is
legally sound.

Dorado stresses that the Panel, in describing Hess's claim
for $168,342.82 in barging costs (only a portion of which were
awarded), stated that "Hess claims it is entitled to recover
. . . barging costs it would not have incurred but for the
<u>mitigation efforts</u> to remedy the effects of the contamination"
and that the Panel awarded part of those barging costs. Award
at 10 (emphasis added). The Panel also awarded a portion of
Hess's claims for inspection costs and spill taxes. <u>Id.</u> But
incidental damages related to cargo damage are commonly awarded
in addition to direct damages. <u>See, e.g.</u>, <u>Amstar</u>, 472 F. Supp.

---

[8] Dorado "does not contest the Panel's decision to apply the market
value rule of damages." Dorado Reply Mem. at 5. Accordingly, the question
is whether the Panel correctly understood the market value rule, not whether
the Panel should instead have followed the reconditioning cost rule.

at 1295 ("Having proved the fact of damage, plaintiff is undoubtedly entitled to recover additional expenses caused by the handling and testing of the damaged cargo."). The inspection fees, spill taxes, and "extra barge costs" that the Panel awarded, describing them collectively as "ancillary losses," Award at 4, may be characterized fairly as incidental damages.

Dorado's attempt to characterize the ancillary losses awarded as mitigation costs might be more persuasive if the Panel had awarded all of the barging costs that Hess sought. But, as discussed above, the Panel only awarded the cost of a single barge movement from ship to shore. That single movement of Barge RTC-103, part of the cost of discharging the Contaminated Fuel in New York, is less easily characterized as a mitigation expense than as an incidental loss of a type routinely awarded in similar cases. Moreover, the Panel expressly declined to award the cost of a different barge "movement [that] involved transport of a parcel of cargo made more valuable by the mitigation efforts," i.e., the Barge RTC-60 movement from the Vessel to Tank 235. Award at 10. Thus, contrary to Dorado's interpretation of the Award, the Panel appears to have denied, rather than granted, mitigation costs.

"We are obliged to give [an] arbitral judgment the most liberal reading possible." Westerbeke, 304 F.3d at 212 n.8. A

plausible -- indeed, a persuasive -- reading of the Award is
that the Panel declined to award mitigation costs, and instead
awarded market value damages plus incidental expenses. Because
that interpretation of the Panel's decision is both plausible
and legally sound, any ambiguity in the wording of the Panel's
decision does not constitute a sufficient basis to refuse to
honor the Award. See Duferco, 333 F.3d at 390.

In sum, Dorado has failed to show that the Award resulted
from the Panel's manifest disregard of the law. Accordingly,
the Award is confirmed.

**E.   Pre-Judgment and Post-Judgment Interest**

The Panel awarded interest to Hess from September 30, 2011,
to July 23, 2014 (the date of the Award), at "the prevailing
prime rate." Award at 11. In this Court, Hess seeks pre-
judgment interest at the annual rate of 3.25 percent, running
from July 23, 2012, until the date of entry of judgment. Dorado
does not address the issue of interest.

"[T]he allowance of prejudgment interest in admiralty
. . . should be granted in the absence of exceptional
circumstances." Mitsui & Co. v. Am. Export Lines, Inc., 636
F.2d 807, 823 (2d Cir. 1981). "[T]he rate of interest used in
awarding prejudgment interest rests firmly within the sound

discretion of the trial court." <u>Ingersoll Milling Mach. Co. v. M/V Bodena</u>, 829 F.2d 293, 311 (2d Cir. 1987).

We think that Hess's request for prejudgment interest running from July 23, <u>2012</u>, rather than July 23, <u>2014</u>, must reflect typographical error, for to grant Hess interest for the intervening period would give Hess the windfall of double interest.  Therefore, pre-judgment interest is awarded only from July 23, 2014, to the date of judgment.  Because Dorado does not object to the interest rate of 3.25 percent, and because that rate is consistent with the interest rate awarded by the Panel,[9] the rate of pre-judgment interest shall be 3.25 percent.

Hess also seeks post-judgment interest.  Post-judgment interest is mandatory, at a variable rate set by federal statute.  28 U.S.C. § 1961; <u>Westinghouse Credit Corp. v. D'Urso</u>, 371 F.3d 96, 100 (2d Cir. 2004).  Accordingly, Hess is entitled to post-judgment interest from the date of the entry of judgment to the date of payment at the statutory rate.

**F.  Attorney's Fees**

The parties agree that, under the charter party, the prevailing party may recover attorney's fees for this action. If the parties are unable to resolve this issue, Hess may move

---

[9] The prevailing prime rate is 3.25 percent.  <u>See</u> Market Data Center, The Wall Street Journal, <u>http://online.wsj.com/mdc/public/page/mdc_bonds.html</u> (last visited Mar. 2, 2015).

for fees within fourteen days after the entry of judgment. Dorado's opposition shall be served within fourteen days after service of the motion, and any reply shall be served within seven days after service of the opposition.  Hess's submission shall be supported by contemporaneous records and shall be organized in a manner that facilitates evaluation.  For example, all hours spent on a specific task shall be aggregated.  Any challenge advanced by Dorado shall be focused on a particular task and shall include a position on the extent to which the amount of fees sought for the task is excessive.

## CONCLUSION

For the preceding reasons, petitioner's petition to confirm the arbitration award is granted and respondent's motion to vacate the arbitration award is denied.  The Clerk of Court is respectfully directed to enter judgment in favor of petitioner in the amount of $1,192,021.25, plus pre-judgment interest from July 23, 2014, at the annual rate of 3.25 percent, and post-judgment interest at the rate set by 28 U.S.C. § 1961.


Dated:     New York, New York
           March 4, 2015


                                   NAOMI REICE BUCHWALD
                                   UNITED STATES DISTRICT JUDGE

27

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Attorney for Petitioner**

James D. Kleiner, Esq.
Hill, Betts & Nash LLP
One World Financial Center
200 Liberty Street, 26th Floor
New York, NY 10281

**Attorneys for Respondent**

Michael Fernandez, Esq.
Michael E. Unger, Esq.
Gina M. Venezia, Esq.
Freehill, Hogan & Mahar LLP
80 Pine Street
New York, NY 10005